UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 4:20-cv-40017

|  |  |
|---|---|
| SHAWN DAVIS, | ) <br> ) <br> ) |
| *PLAINTIFF,* | ) <br> ) |
| VS. | ) <br> ) <br> ) |
| ANNIE DOOKHAN, <br> COMMONWEALTH OF MASSACHUSETTS <br> MIDDLESEX DISTRICT ATTORNEY'S OFFICE, <br> *DEFENDANTS.* | ) <br> ) <br> ) <br> ) <br> ) |

## **COMPLAINT**

### I.  **INTRODUCTION**

This is an action for money damages for the violation of the Plaintiff's constitutional rights brought pursuant to 42 U.S.C. §1983 and M.G. L. c. 12, § 11I. Plaintiff Shawn Davis ["Davis"] alleges that all Defendants acting under color of law contributed or conspired to deprive him of his constitutionally protected rights.

Specifically, once Davis was arrested by members of the Framingham Police Department for possession of cocaine with intent to distribute, and related charges, the police forwarded the substances alleged to be cocaine to the Department of Public Health's Hinton Laboratory ["Hinton Laboratory"] in Jamaica Plain, where former state chemist Annie Dookhan ["Dookhan"] falsified the results of the chemical tests. At that time, Dookhan was engaged in large-scale criminal and fraudulent conduct, including falsifying results, dry labbing, perjury, and forgery. Davis was consequently indicted

and threatened with significant jail time based on large part on the assertion that the substance in his possession at the time of his arrest was tested and found to be cocaine.

Contributing to the numerous violations of Davis' civil rights, Secretary JudyAnn Bigby failed to properly supervise, train, investigate, and monitor the employees of the Department of Public Health and Hinton Laboratory which employed Dookhan. Likewise, the Department of Public Health and its Commissioner Jon Auerbach failed to adequately supervise, train, and monitor the employees of Hinton Laboratory, and then engaged in a cover-up of the offenses. Moreover, the Middlesex County District Attorneys' Office failed to adequately supervise, train and monitor their Assistant District Attorneys, who communicated directly with Dookhan and other chemists during the pendency of their criminal matters, including Davis's case. These failures resulted in the deprivation of Davis's state and federal constitutionally protected rights, including his procedural and substantive due process rights, and the Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States.

## II.   JURISDICTION

Jurisdiction is based upon 28 U.S.C. §§1331 and 1343, and on the pendent jurisdiction of this court to entertain a claim arising under state law and under the Constitution of the United States.

## III.   PARTIES

1. Plaintiff Shawn Davis is a resident of Milford, Massachusetts.

2. Defendant Annie Dookhan ["Dookhan"] was at all times relevant to this complaint a chemist employed by the Commonwealth of Massachusetts Department of Public Health, and at all times relevant to the complaint acted under color of state law. She is being sued in her individual as well as her official capacity with the Department of Public Health.

3. Defendant Commonwealth of Massachusetts ["Commonwealth"] is a sovereign state within the United States of America.

4. The Middlesex District Attorney's Office ["Middlesex DA"] is the office responsible for the prosecution of state cases in Middlesex County. It has a primary office in Woburn, Massachusetts. Its District Attorneys and Assistant District Attorneys prosecute criminal cases on behalf of the Commonwealth and act under color of state law.

### IV.   FACTS

1. On May 22, 2007, the plaintiff was arrested by Framingham Police Officers for distribution of a substance alleged to be cocaine.

2. The substance alleged to be cocaine was forwarded to the State Department of Public Heath, Hinton Laboratory ["Hinton"] for chemical testing and analysis.

3. On or about August of 2007, Annie Dookhan, under the supervision of the aforementioned Hinton lab personnel and under the supervision or in cooperation with other associated personnel, including Della Saunders, issued a certification numbered 818286, falsely stating that on August 1, 2007, she had analyzed a substance and found that said substance contained "Cocaine, a derivative of Coca leaves, as defined in Chapter 94 C, Controlled Substance Act, Section 31, Class B." In fact, Dookhan conducted no scientific testing on the substance.

4. The Middlesex District Attorney's Office used Certification 818286 as a Grand Jury Exhibit in obtaining indictments against Davis for criminal charges including, inter alia, "Cocaine, Possess To Distribute, Subsequent Conviction C94C §32A(D)," Commonwealth v. Davis, Middlesex Superior Court Docket No. 0881CR00895. The

        charge carried a mandatory minimum of three years in state prison with the possibility of a ten year sentence in state prison.

5. The Middlesex County District Attorney's office provided Davis with notice that it intended to call Dookhan and/or Saunders as an expert witness should he intend to go to trial.

6. Along with the falsified analysis reports and certificates, Davis was provided with a copy of Dookhan's Curriculum Vitae ["CV"] in which she falsely claimed to have received her Master of Science Degree in Chemistry from the University Of Massachusetts.

7. Faced with falsified evidence and an over extended prison term, Mr. Davis signed a plea that was neither voluntary nor knowing.

8. On or about June 22, 2009, Davis pled guilty to "Cocaine, Possess To Distribute, Subsq. C94C §32A(D)."

9. Davis was motivated and incentivized to plead guilty based on the falsified drug test received certified by Dookhan and received from the Hinton lab.

10. On or about July 2, 2009, Davis was sentenced to incarceration in state prison for a term of three to five years on the charge of "Cocaine, Possess To Distribute, Subsq. C94C §32A(D)."

11. Davis received 141 days of credit and then served an additional period of or about 1,279 days of incarceration in state prison and a period of or about 237 days of parole before being discharged from parole on or about August 22, 2013. Including the 141 days of credit as incarceration time, Davis served 1,420 days of incarceration and 237 days of parole.

12. In 2017, Davis received a letter from Associate Justice Frank M. Gaziano of the Supreme Judicial Court, dated June 6, 2017, in which Justice Gaziano stated, inter alia, that:

    I am a judge on the Supreme Judicial Court, the highest court in Massachusetts. I am writing to inform you that **the court has dismissed certain conviction(s) against you**. The convictions that have been dismissed are identified on the attached page(s), listed by court, docket number, count, and charge description.

    **Why is the court dismissing these convictions?**

    A chemist named Annie Dookhan engaged in serious misconduct involving her work at a state drug lab. Your case was one of the cases affected by Ms. Dookhan. As a result, the District Attorney's Office decided to undo the conviction(s) listed on the attached page(s) and the court has permanently dismissed them. The legal term is to dismiss "with prejudice." This is final. It means that the government will never be able to pursue the same charges against you in this case. (Emphasis in original). The letter specified the following charge: "0881CR00895 MIDDLESEX SUPERIOR 1 COCAINE, POSSESS TO DISTRIBUTE, SUBSQ. C94C §32A(D)."

13. As detailed in the opinion of the Supreme Judicial Court in <u>Bridgeman v. District Attorney for the Suffolk District</u>, 471 Mass. 465 (2015) (<u>Bridgeman I</u>), and in <u>Bridgeman v. District Attorney for the Suffolk District</u>, 476 Mass. 298 (2017) (<u>Bridgeman II</u>), "Annie Dookhan . . . was employed as a chemist at the William A. Hinton State Laboratory Institute," 305 South Street, Boston, MA 02130 ("Hinton

lab"). Bridgeman II, 476 Mass. at 299-300. "Dookhan began her employment in November, 2003, as a chemist at the Hinton lab, a forensic drug laboratory that was overseen by the Department of Public Health" (DPH). Bridgeman II, 476 Mass. at 301. In or about 2011 or early 2012, "Dookhan was placed on paid administrative leave and then resigned from her position, effective March 9, 2012." Bridgeman II, 476 Mass. at 302. Investigations of Dookhan's conduct revealed that, inter alia:

a. Dookhan "admitted to 'dry labbing' for two to three years prior to her transfer out of the [Hinton] lab in 2011, meaning that she would group multiple samples together from various cases that looked alike, then test only a few samples, but report the results as if she had tested each sample individually."

b. She admitted to "contaminating samples intentionally, including turning negative samples into positive samples on at least a few occasions."

c. She admitted that she removed samples from the evidence locker in breach of Hinton lab protocols, postdated entries in the evidence log book, and forged an evidence officer's initials.

d. She falsified reports intended to verify that the gas chromatography-mass spectrometer machine used in "confirmatory" drug testing was functioning properly before she ran samples through the machine.

e. The potential scope of Dookhan's misconduct encompassed testing samples in over 40,000 cases. This number is so large because Dookhan "reported test results on samples at rates consistently much higher than any other chemist in the [Hinton] lab."

f. Internal citations and footnotes omitted). Bridgeman II, 476 Mass. at 302-303.

14. The conduct of Annie Dookhan, which was not limited to the short and incomplete summary supra, was intentional, reckless, and negligent

15. "A grand jury indicted Dookhan on seventeen counts of tampering with evidence, eight counts of obstruction of justice, one count of perjury, and one count of falsely claiming to hold a graduate degree. Dookhan pleaded guilty to all of the indictments on November 22, 2013[.]" Bridgeman II, 476 Mass. at 303.

16. Related Hinton Lab misconduct was rampant. The Affidavit of Anne Goldbach, Director of Forensic Services for the Committee for Public Counsel Services, and associated exhibits, in the Bridgeman I Joint Record Appendix of the Petitions and the Committee for Public Counsel Services ("Bridgeman I R.A.") at R.A. 112-311, contains a partial discussion of examples of such misconduct. Examples include, but are not limited to:

    a. As of on or about March 30, 2004, the Hinton Lab, at the direction of Department Supervisor Charles Salemi, the Quality Assurance Director, State Lab Director, Program Director, and Quality Assurance Program Manager implemented a system of testing in which two chemists both tested samples and signed the same certification. See Bridgeman I R.A. at R.A. 114-129. The Hinton lab personnel assigned Annie Dookhan to be either the primary or secondary/confirmatory chemist on numerous samples. Bridgeman I R.A. at R.A. 129-131. In that capacity, "Annie Dookhan failed to follow procedures required for analysis, and . . . she created fraudulent documentation." Bridgeman I R.A. at R.A. 129. "Certain conditions at the [Hinton lab] might have enhanced . . . vulnerability [to the misconduct of Dookhan]. For example,

      there were numerous instances when chemists worked alone rather than as teams or side-by-side" (internal citations omitted). <u>Bridgeman I</u> R.A. at R.A. 130-131.

b. Dookhan engaged in numerous additional acts of misconduct not explicitly discussed in the Bridgeman II decision. See, e.g., <u>Bridgeman I</u> R.A. at R.A. 131-136, 139-147.

c. "Many issues with Dookhan were allowed to continue for years. Numerous lab personnel expressed concerns with Dookhan's workload and documentation errors . . ., forgeries . . ., and questionable test results" (internal citations omitted). <u>Bridgeman I</u> R.A. at R.A. 136. "When lab supervisor [Peter] Piro reported numerous concerns regarding Dookhan's conduct at the lab to his superior, Charles Salemi (lab supervisor II), Salemi only conducted an audit of paperwork for every tenth sample and no actual re-testing was performed" (internal citations omitted). <u>Bridgeman I</u> R.A. at R.A. 136.

d. "The laboratory evidence room and evidence safe were accessible to chemists . . . . The procedures to restrict access were ignored and circumvented . . . . The safe was found open and unattended . . ., was left propped open when it was 'busy' . . ., and was accessible by codes and keys that had not been changed in over a decade . . ." (internal citations omitted). <u>Bridgeman I</u> R.A. at R.A. 137.

e. "There were insufficient safeguards on access to the evidence room, and to the evidence safe, which could be accessed by means of a key or a palm reader." <u>Bridgeman I</u> R.A. at R.A. 137.

f. "The method of samples being checked in and out suffered from lack of

    oversight, as whole sets of drug samples could be pulled by Dookhan without anyone noticing . . ." (internal citations omitted). <u>Bridgeman I</u> R.A. at R.A. 137.

g. "The evidence officers who were in charge of security of the evidence safe had an apparent pattern of laxity when it came to tracking samples and access to the evidence room and safe, computer terminals . . ., and written logbooks . . ." (internal citations omitted). <u>Bridgeman I</u> R.A. at R.A. 138.

h. "The lab followed SWGDRUG [Scientific Working Group for the Analysis of Seized Drugs] guidelines from 2004, but those standards are general and lack specific detail as to the policies, procedures and protocols that should be followed at the lab . . ." (internal citations omitted). <u>Bridgeman I</u> R.A. at R.A. 138.

i. "Unlike other labs at the Hinton facility, the drug lab had no surveillance cameras and no mechanism to detect, monitor and report adverse events and poor quality events . . . ." (internal citations omitted). <u>Bridgeman I</u> R.A. at R.A. 138.

j. "There was a lack of supervision and oversight at the lab: Director [Julianne] Nassif did not meet with lab supervisor [Charles] Salemi on a regular basis, and had difficulties meeting with staff . . ." (internal citations omitted). <u>Bridgeman I</u> R.A. at R.A. 138.

k. "[I]tems, discovered during the Inspector General's investigation, were in various unsecured locations at the Hinton Lab including the floor, in desks, in drawers, in a drying hood cabinet, taped to a lab bench and in a freezer." <u>Bridgeman I</u> R.A. at R.A. 139.

   l.  "[T]he Hinton Lab [had] inadequate management and operations as compared to standards promulgated by the relevant scientific community." Bridgeman I R.A. at R.A. 147.

   m.  "[T]he Hinton Lab was not accredited and lacked the resources to support the application for accreditation . . ." (internal citations omitted). Bridgeman I R.A. at R.A. 147.

   n.  No process for routine review and revision of the 2004 standard operating procedures or for periodic written documentation of compliance existed. Bridgeman I R.A. at R.A. 148.

17. The foregoing misconduct, and other misconduct, by Assistant Analyst Della Saunders, Lab Director Linda Han, Program Manager Julianne Nassif, Lab Supervisor II Charles Salemi, Laboratory Supervisor I Elizabeth O'Brien, Lab Supervisor Peter Piro, Commissioner of the Department of Public Health John Auerbach, Secretary of Health and Human Services JudyAnn Bigby, and other involved personnel, was intentional, reckless, and negligent.

18. JudyAnn Bigby ["Secretary Bigby"] was at all times material to the allegations in this complaint the duly appointed Secretary of Executive Office of Health and Human Services ["EOHHS"] of the Commonwealth of Massachusetts. As such, she was responsible for oversight of the Department of Public Health and acted under the color of state law.

19. Secretary Bigby was directly responsible for the policies, practices, and customs of the Hinton Laboratory employees, and for their supervision and training. Secretary Bigby was also the direct supervisor of the former Commissioner of Public Health, Jon

      Auerbach ["Commissioner Auerbach"].

20. Commissioner Auerbach was the duly appointed Public Health Commissioner at all times relevant to the complaint. As such, he oversaw the policies, customs and practices of the Hinton Lab and acted under color of state law.

21. At least by June 2011, Secretary Bigby was aware that Dookhan was testing and certifying substances at a rate that was fifty percent higher than any other chemist. She described Dookhan's extremely high productivity as, "a red flag that wasn't appropriately investigated."

22. Secretary Bigby and Commissioner Auerbach maintained outdated operating procedures for the Hinton Lab, and undertook no action toward independent accreditation.

23. As early as 2008, Auerbach met with one of Dookhan's supervisors to discuss the problems at Hinton lab.

24. Auerbach initiated an investigation of Dookhan's conduct in December 2011 which failed to produce the evidence of gross misconduct discovered by the State Police during their investigation months later.

25. At the time of Auerbach's investigation, the Hinton Lab was working from a grant with the State Police that required quarterly reports, including reports of gross misconduct. Auerbach therefore failed to notify the State Police of Dookhan's misconduct until several months later, while working out the wording of the gross negligence report.

26. In December, 2012, Commissioner Auerbach resigned from his post as Commissioner of the Department of Public Health. Upon his resignation, Auerbach issued this statement: "It is clear that there was insufficient quality monitoring, reporting, and

investigating on the part of supervisors and managers surrounding the former Department of Public Health drug lab in Jamaica Plain."

27. Linda Han ["Han"] was at all times relevant to this complaint employed by the Department of Public Health as the Director of Hinton Lab. As such, she created, maintained or implemented the policies, customs and practices of the Hinton Lab and acted under color of state law.

28. Julie Nassif ["Nassif"] was at all times relevant to this complaint employed by the Commonwealth of Massachusetts Department of Public Health and was in charge of the Division of Analytical Chemistry, including that at Hinton Lab. As such, she created, maintained or implemented the policies, customs and practices of the Hinton Lab and acted under color of state law. Han was Nassif's direct supervisor.

29. Auerbach intentionally withheld the findings of his investigation from certain supervisors of the Hinton Laboratory, including Han and Nassif (although with their knowledge), so that they would not be subject to examination in court.

30. Hinton lab supervisors Han and Nassif failed to monitor Dookhan adequately, failed to alert their superiors to problems, and allowed her to continue to have access to substances, to test substances, and to testify in court even after the breach in June 2011.

31. Charles Salemi ["Salemi"] was at all times relevant to this complaint employed by the Department of Public Health as the supervisor of operations. As such, he created, maintained or implemented the policies, customs and practices of the Hinton Lab and acted under color of state law. He was supervised by Nassif.

32. Elizabeth O'Brien ["O'Brien"] was at all times relevant to this complaint employed by

the Department of Public Health as a supervisory evidence officer at Hinton Lab. As such, she created, maintained or implemented the policies, customs and practices of the Hinton Lab and acted under color of state law. O'Brien was supervised by Nassif.

33. In September of 2012, the Attorney General's Office launched an investigation into the misconduct at Hinton. Based on interviews of Hinton employees, including Dookhan, the State Police reported the following:

   a. Dookhan forged other chemists' and evidence officers' initials in an unknown number of instances, including on Quality Assurance and Quality Control documents. She ignored lab procedures by loading and running her own samples on the GC/MS.

   b. Dookhan failed to properly run QC/QA test samples, instead purposefully making up test result numbers on the "Quality Control Daily Injector Test" on the GC/MS.

   c. Dookhan maintained a level of production of test results that concerned supervisors and co-workers, often analyzing more samples in a week than they did in a month. She was submitting racks upon racks of sample vials to the confirmatory chemists, and leaving many samples out on her bench top.

   d. Dookhan exhibited a pattern of failing basic laboratory procedures , including documentation issues, failing to calibrate balances, and having a work space filled with numerous vials open to cross contamination.

   e. Dookhan was allowed to access the evidence office computers in order to enter and look up data even after she was suspended from lab duties.

   f. Dookhan engaged in the practice of "dry labbing," looking at the samples

instead of testing them with the presumptive testing. Dookhan was not using the proper method of inspecting slides prepared for a microscope. This resulted in an unknown number of samples coming back as heroin when Dookhan had supposedly tested it and found it to be cocaine and vice versa. Dookhan would then alter these samples so that they would come out the way she wanted.

g. Dookhan was contacted directly by ADAs about specific samples, which she would then "pull" for analysis, even out of order, despite lab policies forbidding both this contact and action.

h. Dookhan accessed the labs numerous times while suspended and also many times without any supervision of the evidence room.

i. Dookhan had a key and unfettered access to the evidence room and safe.

j. The Laboratory had a culture of lax oversight, as many issues with Dookhan were allowed to continue for years, even having her responsible for training and for some QA/QC procedures.

k. In 2010, Dookhan's work was audited due to concerns about her workload. However, samples were not retested. Rather, it appears paperwork was simply reviewed.

l. The Department of Public Health did not retain records when a sample was resubmitted and retested; the number of any retests was not tracked or audited in any manner.

m. Numerous lab personnel expressed concerns with Dookhan's workload, documentation errors, blatant forgeries, and questionable test results, but no action was taken against her.

n. The laboratory evidence room and evidence safe were accessible to an unknown amount of chemists and employees of the laboratory.

o. The procedures to restrict access to the evidence room were ignored and circumvented. The safe was found open and unattended, was left propped open when it was "busy," and was accessible by codes and keys that had not been changed in over a decade.

p. An unknown number of chemists had keys to the safe.

q. The palm reader access point to the evidence room was not recording those who entered, or that information was not preserved properly, or was destroyed, and as of the date of this complaint the State Police Investigation has not uncovered any records of access to the evidence room via the palm reader.

r. In June 2011, Han and Nassif discovered Annie Dookhan had breached protocol and removed 90 samples from the evidence room without authorization.

s. Han and Nassif did not properly investigate the specific breach of protocol, her workload, her results, and/or her general lack of adherence to protocol. They also failed to make written findings of her resubmittals or other QC/QA issues that were recorded.

t. The method of samples being checked in and out suffered from lack of oversight, as whole sets of numbers could be pulled by Dookhan without anyone noticing.

u. The evidence officer or officers had a pattern of laxity when it came to tracking samples and access to the evidence room and safe, computer terminals, and

        written logbooks.

    v. On or around December 2011, when it was clear that an unknown number of keys opened the safe, Auerbach began an investigation into Dookhan.

    w. Salemi started checking keys, and perhaps switching them out.

    x. Although Nassiff began checking keys for Dookhan and a few others, no plan to check every key was made, nor to take an inventory of who had keys to the evidence room.

    y. The Hinton lab did not appear to have or to enforce any safeguards or policies to prevent assistant district attorneys and police officers from contacting a specific chemist about a specific case or cases.

    z. Dookhan lied about receiving a Master's Degree in Chemistry from University of Massachusetts as listed in her resume or curriculum vitae, which she gave to the Assistant District Attorney handling Davis' case. This false information was used by the District Attorney's Office through the course of discovery in preparation for trial.

34. At all times relevant to the allegations contained in this complaint, Han, Nassif, Salemi and O'Brien created, maintained and/or implemented the policy, custom and practice of failing to conduct oversight, investigate complaints, report violations, enforce safeguards or policies, and ensure the integrity of the samples while stored at the Hinton Laboratory Evidence Room.

35. District Attorney Gerard T. Leone Jr., ["Leone"] was at all times material to the allegations in the complaint the duly elected District Attorney of Suffolk County and acted under color of state law.

36. Secretary Bigby, Commissioner Auerbach, and Leone all failed to prohibit direct contact between DPH chemists and prosecuting Assistant District Attorneys prior to testing the substances in the cases being prosecuted. They also failed to train their employees concerning any existing policies of communicating between Hinton lab and the District Attorneys' Offices. The Middlesex County District Attorney's Office failed to enact any internal policy concerning communications between chemists and assistant district attorneys. Rather, the policy, custom and practice provided for direct communication between the chemists and prosecuting assistant district attorneys prior to testing the alleged substances.

37. The Defendants' acts and omissions described throughout paragraphs 1-33 of this complaint directly and proximately caused or contributed to the deprivations of the Plaintiff's rights, thereby causing the plaintiff to suffer severe permanent personal and emotional injuries, including but not limited to loss of liberty, loss of income, humiliation, emotional distress and the loss of companionship.

## V. CLAIMS
## COUNT I
## VIOLATION OF RIGHT SECURED BY THE FOURTH, FIFTH, SIXTH, AND FOURTEENTH AMENDMENT 42 U.S.C. §1983 BY DEFENDANTS DOOKHAN, THE COMMONWEALTH OF MASSACHUSETTS, AND THE MIDDLESEX COUNTY DISTRICT ATTORNEY'S OFFICE

38. The plaintiff restates and realleges the allegations set forth in the preceding paragraphs and incorporates said allegations as though they were set forth herein.

39. By the actions described in the preceding paragraphs, all Defendants to this action so named above, acting under color of law deprived the Plaintiff of due process of law, procedurally and substantively, in violation of 42 U.S.C. §1983 and the Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States and are jointly liable.

40. As a proximate result of these actions, Davis has suffered damages in an amount to be determined at trial.

## COUNT II
## VIOLATION OF 42 U.S.C. §1983 CONSPIRACY BY DEFENDANTS DOOKHAN AND THE MIDDLESEX COUNTY DISTRICT ATTORNEY'S OFFICE

41. The plaintiff restates and realleges the allegations set forth in the preceding paragraphs and incorporates said allegations as though they were set forth herein.

42. By the actions described in the preceding paragraphs, the Defendants so named in this count conspired together to deprive the Plaintiff of exculpatory evidence, a fair trial, and his procedural and substantive constitutional rights and are jointly liable.

43. As a proximate result of these actions, Davis has suffered damages in an amount to be determined at trial.

## COUNT III
## VIOLATION OF M.G.L. c. 12 §111 BY DEFENDANTS DOOKHAN AND THE MIDDLESEX COUNTY DISTRICT ATTORNEY'S OFFICE

44. The plaintiff restates and realleges the allegations set forth in the preceding paragraphs and incorporates said allegations as though they were set forth herein.

45. By the actions described in the preceding paragraphs, Defendants Dookhan and Middlesex County District Attorney's Office deprived the Plaintiff of his civil rights, secured by the Constitutions of the United States and the Commonwealth of Massachusetts, through the use of threats, intimidation, and coercion, in violation of M. G. L. c. 12, §111.

46. As a proximate result of these actions, Davis has suffered damages in an amount to be determined at trial.

**COUNT IV**
**CONSPIRACY TO VIOLATE M.G.L. c. 12 §111 BY DEFENDANTS DOOKHAN AND THE MIDDLESEX COUNTY DISTRICT ATTORNEY'S OFFICE**

47. The plaintiff restates and realleges the allegations set forth in the preceding paragraphs and incorporates said allegations as though they were set forth herein.

48. By the actions described in the preceding paragraphs, Defendants Dookhan and Middlesex County District Attorney's Office while acting under color of state law, did conspire to deprive the Plaintiff of his civil rights, secured by the Constitutions of the United States and the Commonwealth of Massachusetts, through the use of threats, intimidation, and coercion, in violation of M.G.L. c. 12, §111.

49. As a proximate result of these actions, Davis has suffered damages in an amount to be determined at trial.

WHEREFORE, the Plaintiff requests that this Honorable Court:

1. Award compensatory damages, including prejudgment interest, against all the Defendants jointly and severally;

2. Award punitive damages, including prejudgment interest, against all the Defendants;

3. Award the costs of this action, including reasonable attorney's fees and other associated expenses.

## VI.     JURY DEMAND

Pursuant to Rule 38 (b) of the Federal Rules of Civil Procedure, the Plaintiff hereby demands a jury trial for all issues so triable.

                SHAWN DAVIS,

                By His Attorney

                /s/Matthew J. Holmes
                Matthew Holmes, Esquire
                BBO No. 675994
                Eden Rafferty
                238 Shrewsbury Street
                Worcester, MA 01604
                (508) 795-1601
                mholmes@edenrafferty.com